UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | | |
|---|---|---|
| RICK GRIFFIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 4:17-cv-00189-RLY-DML |
| | ) | |
| DUKE ENERGY INDIANA, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Rick Griffin is a former employee of Defendant Duke Energy Indiana, LLC. Because of personal health issues, Plaintiff requested and was granted leave pursuant to the Family and Medical Leave Act of 1993 ("FMLA"). Upon his return from FMLA leave, Defendant terminated Plaintiff's employment.

On October 5, 2017, Plaintiff filed a complaint alleging Defendant interfered with the exercise of his FMLA rights and retaliated against him for taking FMLA leave. On December 14, 2018, Defendant filed a Motion for Summary Judgment; the Motion is now fully briefed. The court, having read and reviewed the parties' submissions, the designated evidence, and the applicable law, now **GRANTS** Defendant's Motion for Summary Judgment.

**I.      Background**

**A.      Plaintiff's Employment**

Plaintiff worked for Defendant, a national power company, for nearly twenty-seven years. (Filing No. 43-1, Ex. 1, Deposition of Rick Griffin ("Plaintiff Dep.") at 86,

235).  He began his employment in October 1990 as a senior meter reader.  (*Id.* at 86).  In

October 2016, Plaintiff was appointed interim C&M (Construction & Maintenance) field

supervisor in Madison, Indiana.  (*Id.* at 146; Filing No. 43-2, Ex. 2, Declaration of

Andrew Cassidy with exhibits ("Cassidy Decl.") at 1 ¶ 4).  As a field supervisor, Plaintiff

was expected to "assign and manage field crews in his area, exercise leadership in his

decision-making, and set an example for his crews."  (*Id.*).

During his employment, Plaintiff had access to Defendant's Information

Technology ("IT") Asset Policy, Phone Policy, Code of Business Ethics, and Employee

Expense and Corporate Card Policy.  (Plaintiff Dep. at 93, 95, 98).

### B.    Plaintiff's December 2016 Discussion with Andy Cassidy

Plaintiff had a corporate credit card, and his monthly reconciliations were

reviewed by Andy Cassidy, Interim General Manager of C&M.  (Cassidy Decl. at 2-3 ¶

8, 10).  In December 2016, Cassidy reviewed Plaintiff's charges for October/November

2016 and noticed Plaintiff had used his company credit card for a hotel room charge in

Plainfield, Indiana, prior to a mid-morning company meeting.  (*Id.* at 3 ¶ 11).  However,

the charge was unnecessary as Plaintiff only lived two hours away, and no other

employee stayed in a hotel to attend the meeting.  (*Id.*).  During an ensuing discussion

between Plaintiff and Cassidy that same month, Plaintiff testified he mistakenly thought

the meeting was at 7:00 a.m.  (Plaintiff Dep. at 168-69).  Cassidy did not reprimand

Plaintiff, but he reminded him that his company credit card was only for appropriate

company use.  (Cassidy Decl. at 3 ¶ 11).

### C. Plaintiff's January 20, 2017 Meeting with Toebbe and Garmon

Also in December 2016, Plaintiff filed for a divorce, and it quickly turned ugly. (Plaintiff Dep. at 133). Plaintiff's wife had dropped him from their cell phone plan. (*Id.* at 223). And in January 2017, she emailed Cassidy accusing Plaintiff of using his company credit card to make personal purchases and taking cases of beverages from the company. (Cassidy Decl. at 3-4 ¶ 12; Plaintiff Dep. at 177; Filing No. 43-2, Ex. B, Pl.'s Wife Jan. 18, 2017 Email). She also said he had multiple fraud cases pending, had been abusing his company vehicle, and was having an extramarital affair. (Plaintiff Dep. at 177; Filing No. 43-2, Ex. B, Pl.'s Wife Jan. 18, 2017 Email). Cassidy forwarded the email to Bernadette Toebbe, an HR consultant. (Cassidy Decl. at 3-4 ¶ 12). Because the allegations were based on fraud and wrongdoing, Toebbe had a phone conversation with her supervisor, Jerri Garmon, before reaching out to Cathy Ann Chase, the leader of Defendant's employee relations investigation team. (Filing No. 48-1, Ex. A, Bernadette Toebbe Deposition ("Toebbe Dep.") at 48, 52).

On January 20, 2017, as part of Defendant's ongoing investigation, Plaintiff met with Toebbe and Garmon. (Toebbe Dep. at 36-38, 41; Filing No. 43-3, Ex. C, Def.'s Jan. 20, 2017 HR Investigation Interview Documentation). During the meeting, Plaintiff admitted he used his company credit card by mistake for a hotel stay in Bloomington, Indiana. (Plaintiff Dep. at 198, 202). Toebbe and Garmon told Plaintiff that per Defendant's policy, he was not to use his company credit card for personal expenses. (Plaintiff Dep. at 198-99, 201; Toebbe Decl. at 3 ¶ 8; Filing No. 43-2, Ex. A, Employee Expense and Corporate Card Policy at 2 ("Employees should not use the Corporate

Credit Card for . . . personal expenses.")).  Plaintiff understood.  (Plaintiff Dep. at 199 (Q: "So when you left that meeting in January of 2017 with Ms. Toebbe and [Ms.] Garmon, you understood that you shouldn't use your company credit card for personal expenses; correct?"  A: "Yes.")).

Unable to substantiate Plaintiff's wife's claims, Toebbe and Garmon considered the investigation closed.  (Toebbe Decl. at 3 ¶ 8; Cassidy Decl. at 4 ¶ 12).  Following the meeting, on January 31, 2017, Toebbe sent an email to Chase and wrote "everything was legitimate with [Plaintiff's] responses."  (Filing No. 43-3, Ex. E, Toebbe January 31, 2017 Email).  Toebbe further noted that "nothing appears out of line or in violation of CoBE [Code of Business Ethics] or any other policy."  (*Id.*).

In addition to the discussion regarding Plaintiff's credit card statement, Toebbe asked Plaintiff about a meeting she understood him to have with Cassidy over his attendance and availability in Madison.  (Filing No. 43-3, Ex. D, Def's Jan. 20, 2017 HR Investigation Interview Documentation at ecf p. 22).  Plaintiff responded that Cassidy talked to him about his attendance because he had two sick days one week and was on vacation the next week.  (*Id.*).  Plaintiff admitted he had given Cassidy short notice for his absences.  (*Id.*).  He also informed Cassidy he had applied for intermittent FMLA leave to pursue counseling for his divorce.  (*Id.*).  Cassidy told Plaintiff he needed to provide sufficient notice of his absences so that Cassidy could have someone else cover the Madison office.  (*Id.*).

### D. Plaintiff's FMLA Leave

Soon after being approved for intermittent FMLA, Defendant's third party administrator Liberty Mutual approved continuous FMLA leave from January 26, 2017, until March 8, 2017. (Plaintiff Dep. at 207-08). While on continuous FMLA leave, Plaintiff retrieved his work laptop at Defendant's premises but was scolded by Toebbe for being on-site. (*Id.* at 212, 219). Because of Toebbe scolding him, Plaintiff testified he did not reconcile any personal company credit card expenses on his work laptop while on FMLA leave. (*Id.* at 219-220).

During Plaintiff's leave, a Work Management Specialist in the Madison office brought Plaintiff's December/January credit card statement to Cassidy's attention. (Cassidy Decl. at 4 ¶ 15). Toebbe and Cassidy discovered previously undisclosed personal hotel charges and unauthorized personal cell phone charges attributed to Plaintiff. (Filing No. 48-8, Ex. H, Toebbe and Garmon Feb. 13, 2017 Emails). On February 21, 2017, Toebbe sent an email to Garmon and Chase seeking permission to initiate a second investigation into Plaintiff. (Filing No. 43-3, Ex. J, Toebbe Feb. 21, 2017 Email). In this email, Toebbe wrote that Plaintiff incurred hotel bills of nearly $500 and an unauthorized cell phone bill of "approximately $400" in usage. (*Id.*). On March 4, 2017, Toebbe sent an email to Diane Smiley, an HR representative, asking if Plaintiff had ever been disciplined previously for excessive texting. (Filing No. 43-3, Ex. L, Toebbe March 4, 2017 Email). While Smiley could recollect such an incident from her personal memory, she could not provide any formal company documentation regarding it. (*Id.*).

### E.    Plaintiff's March 9, 2017 Meeting with Toebbe and Cassidy

Upon returning to work on March 9, 2017, Plaintiff met with Toebbe and Cassidy as part of Defendant's second investigation.  (Plaintiff Dep. at 213; Toebbe Decl. at 5 ¶ 15; Filing No. 43-3, Ex. K, Def.'s Mar. 9, 2017 HR Investigation Interview Documentation).  Toebbe and Cassidy questioned Plaintiff about hotel charges and a room service charge in Louisville, Kentucky, incurred on December 30, 2016 and again on December 31, 2016 to January 1, 2017.  (Filing No. 43-3, Ex. J, Toebbe Feb. 21, 2017 Email; Filing No. 43-3, Ex. K, Def.'s Mar. 9, 2017 HR Investigation Interview Documentation).  The hotel invoice from the Galt House showed that two people had stayed at the hotel and ordered room service, and payment had been made with two separate charges on Plaintiff's company credit card.  (Plaintiff Dep. at 213; *see also* Filing No. 43-3, Ex. G, Galt House Hotel Invoice).  Plaintiff also had a Wal-Mart charge that he had previously not disclosed for a work-related GPS car Garmin.  (Cassidy Decl. at 4 ¶ 15; Plaintiff Dep. at 218).

Plaintiff told them he was accompanied by his girlfriend during his Galt House stay and that all incurred hotel charges were personal.  (Plaintiff Dep. at 214).  Plaintiff explained he could not use a personal credit card because of insufficient credit, so he used his company credit card instead.  (*Id.* at 215, 217).  Plaintiff testified he was not trying to hide the charges, stating, "You don't hide charges that you put on your company credit card.  They're going to show up.  I was going to check the box and pay them like we always do and have done for twenty-six years."  (*Id.* at 215).  Plaintiff later

testified he may have used his company credit card instead because he "wasn't paying attention to what I had given them. I don't know." (*Id.* at 217).

Toebbe and Cassidy also asked Plaintiff why he had not mentioned the Galt House charges when he met with them previously on January 20, 2017. (Toebbe Decl. at 5 ¶ 17). Plaintiff explained he forgot to disclose the charges because "[his] mind got focused on that discussion, and it didn't go anywhere else." (Plaintiff Dep. at 214).

Plaintiff also omitted the Galt House charges from his company credit card reconciliations all together which ran contrary to company policy.[1] (Cassidy Decl. at 5 ¶ 17; Toebbe Decl. at 2 ¶ 8-10). Cassidy testified Plaintiff's omission occurred even though Plaintiff had submitted his expense reconciliations for December 2016 and January 2017 while on FMLA leave—which should have included the Galt House charges. (Cassidy Decl. at 5 ¶ 17). Plaintiff testified he did not personally submit any expense reconciliations because of his laptop retrieval incident with Toebbe. (Plaintiff Dep. at 219). Instead, Plaintiff stated another employee submitted his December 2016 and January 2017 expense reconciliations on his behalf. (*Id.* at 220).

In the meeting, Toebbe and Cassidy reminded Plaintiff of Defendant's electronics policy that prohibits company-provided electronics from being used for personal

---

[1] Defendant's Employee and Corporate Card Policy states "[o]ut of pocket expenses and corporate card expenditures should be submitted and approved within 30 days of expenditure. All expenses must be reconciled within 60 days . . . ." (Filing No. 48-5, Ex. E, Expense Policy at 3).

communications that cause additional costs to the company.[2]  Toebbe and Cassidy discussed with Plaintiff his unauthorized use of a company cell phone previously assigned to Michael Licklyter, who had left the company on long-term disability leave. (Plaintiff Dep. at 222; Cassidy Decl. at 5 ¶ 19).  During this time, Plaintiff communicated more than 600 text messages, some of which were inappropriate texts to his girlfriend.  (*Id.* at 222, 227).  As a result, Plaintiff's use of Licklyter's phone cost Defendant $207.90 with $49.70 in texting charges alone.  (Filing No. 43-2, Ex. F, Cassidy Feb. 10, 2017 Email).

Plaintiff admitted to using Licklyter's phone from December 2nd-18th, 2016 for both personal and business use because his wife had dropped him off their phone plan. (Plaintiff Dep. at 223, 225).  Plaintiff mistakenly thought company cell phones had unlimited talk/text and was surprised to learn Defendant had incurred additional costs on his behalf.  (*Id.*).  He stated he had never been approached by Defendant prior to the March 9th meeting for excessive texting.  (*Id.* at 241-42).  When asked why he did not reactivate his personal phone under an individual plan, Plaintiff stated he "had a lot going on" and "was trying to handle personal stuff."  (*Id.* at 224-25).  Toebbe and Cassidy informed Plaintiff that his conduct was unacceptable, and Plaintiff apologized for an "error in judgment."  (*Id.* at 233-34).

---

[2] Defendant's IT Asset Policy states that all company cell phones are provided for conducting business use, any usage must comply with its Code of Business Ethics, and that violation of the policy could result in termination.  (Filing No. 43-3, Ex. L, IT Asset Management Policy with Rev. Date April 18, 2012).  Defendant's phone policy states "it is acceptable to use company telephones . . . for incidental and infrequent use so long as you don't abuse the privilege." (Filing No. 48-6, Ex. F, Phone Policy).

Because Plaintiff violated Defendant's policies and Code of Conduct, Toebbe and Cassidy suspended Plaintiff following the March 9th meeting pending further review of his conduct. (*Id.* at 235; *see also* Toebbe Dep. at 79).

### F. Plaintiff's March 20, 2017 Termination Meeting with Toebbe and Cassidy

Following the March 9th meeting with Plaintiff, Toebbe discussed the investigation with Garmon, who submitted the investigation findings to Defendant's management. (Toebbe Decl. 5-6 ¶ 19). Plaintiff's termination was approved by Michael Lewis, Senior Vice President and Chief Distribution Officer, Dave Maxon, Senior Vice President of Distribution Construction and Maintenance, and Anthony Rose, HR Director. (*Id.*).

On March 20, 2017, Toebbe and Cassidy met with Plaintiff at Defendant's Seymour operations center. (Plaintiff Dep. at 236). Defendant provided Plaintiff a non-union corrective action notice which stated that based on a totality of Plaintiff's conduct—including his misuse of company resources and a behavioral pattern unbecoming of a supervisor—he was terminated immediately. (Filing No. 43-2, Ex. G, Def.'s Mar. 20, 2017 Non-Union Corrective Action Notice).

## II. Summary Judgment Standard

Summary judgment is appropriate when the record shows that there is "no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). To survive summary judgment, the nonmoving party must present specific facts showing the existence of a genuine dispute for trial. *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A genuine dispute as to any material fact

exists if, based on the evidence presented, a reasonable jury could find in favor of the

non-moving party on a particular issue. *Id.* at 248. In deciding whether genuine, factual

disputes exist, the court construes all facts in a light most favorable to the nonmoving

party and draws all reasonable inferences in favor of the non-moving party. *Id.* at 255.

## III. Discussion

Plaintiff brings two claims against Defendant. First, he alleges Defendant

unlawfully interfered with his FMLA rights and second, he alleges Defendant retaliated

against him for exercising his right to take FMLA leave.

### A. Interference

Under the FMLA, it is unlawful for an employer to interfere with an employee's

attempt to exercise his or her FMLA rights. *Ridings v. Riverside Medical Center,* 537

F.3d 755, 761 (7th Cir. 2008). In his complaint, Plaintiff alleged an FMLA interference

claim, but he did not respond to Defendant's motion for summary judgment regarding it.

Therefore, Plaintiff's FMLA interference claim is waived, and Defendant's motion for

summary judgment on Plaintiff's interference claim is **GRANTED**. *Ennin v. CNH*

*Indus. America, LLC,* 878 F.3d 590, 595 (7th Cir. 2017) (where the Seventh Circuit noted

that "failure to respond to an argument generally results in waiver").

### B. Retaliation

Under the FMLA, it is also "unlawful for any employer to discharge or in any

manner discriminate against any individual for opposing any practice made unlawful" by

the FMLA. 29 U.S.C. § 2615(a)(2). To establish an FMLA retaliation claim, the

plaintiff must show that: (1) he engaged in protected activity; (2) he suffered an adverse employment action; and (3) a causal connection exists between the two. *King v. Ford Motor Co.,* 872 F.3d 833, 841 (7th Cir. 2017). Once the plaintiff has established a prima facie case, the burden shifts to the employer to offer a legitimate, non-discriminatory reason for the termination. *King v. Preferred Technical Group,* 166 F.3d 887, 892 (7th Cir. 1993). If the defendant meets its burden, the presumption raised by the prima facie case is rebutted. *Id.* (further citation omitted). "The plaintiff, then, has the opportunity to demonstrate that 'the proffered reason was not the true reason for the employment decision' and that the employee's participation in the protected activity was, in fact, the real reason . . . ." *Id.* (quoting *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 256 (1981)). "At all times throughout this burden-shifting approach, the plaintiff retains the ultimate burden of persuasion." *Id.*

### 1. Prima Facie Case

There is no dispute that Plaintiff met the first two elements of his prima facie case. As such, his FMLA retaliation claim hinges on whether he has established a causal connection between his FMLA leave and termination. In making this determination, the court considers the evidence as a whole and asks whether a reasonable jury could draw an inference of retaliation. *Id.* at 842 (citing *Ortiz v. Werner Enters., Inc.,* 834 F.3d 760, 764-66 (7th Cir. 2016)). A causal connection may be established through circumstantial evidence such as "suspicious timing, ambiguous statements from which retaliatory intent can be inferred, evidence of similar employees being treated differently, or evidence that

the employer offered a pretextual reason for the termination." *Lagenbach v. Wal-Mart Stores, Inc.,* 761 F.3d 792, 800 (7th Cir. 2014).

In support of his retaliation claim, Plaintiff argues the following establish a causal connection: 1) his decades-long employment with Defendant demonstrated that he met its legitimate expectations; 2) Defendant began the termination process while Plaintiff was on FMLA leave, creating a temporal proximity between the leave and termination; 3) Defendant's agents made statements expressing disapproval of Plaintiff's leave and that it was burdening the Madison office; 4) no other employee was terminated (or even disciplined) for a one-time failure to reconcile expenses, or personal texting; and 5) the evidence suggests that Defendant has offered a pretextual reason for termination.[3]

For the first factor, Plaintiff ignores his behavior and misconduct immediately preceding his termination—which included the misuse of company resources and failure to be forthright. *Peele v. Country Mut. Ins. Co.,* 288 F.3d 319, 329 (7th Cir. 2002) ("the issue is not the employee's past performance but whether the employee was performing well at the time of [his] termination"). For the second factor, while Plaintiff argues that his FMLA leave and termination were close in proximity, timeliness alone is insufficient to demonstrate a causal connection. *O'Leary v. Accretive Health, Inc.,* 657 F.3d 625, 635 (7th Cir. 2011) (noting "temporal proximity between an employee's protected activity and an adverse employment action is rarely sufficient to show that the former caused the latter."). For the third factor, the issues of "attendance and availability" Cassidy

---

[3] For the purposes of this analysis, the court will address Plaintiff's remaining pretext factor separately.

discussed with Plaintiff were a result of Plaintiff providing short notice to Cassidy when calling in absences, and Cassidy needing to find someone to cover for Plaintiff at the Madison office. For the fourth factor, Plaintiff presents no evidence of any employee who committed a one-time failure to reconcile expenses or personal texting and remained employed. As a result, Plaintiff has failed to establish his prima facie case for retaliation, and summary judgment in favor of Defendant is appropriate. *King*, 872 F.3d at 841.

### C.    Pretext

Even if Plaintiff could establish a prima facie case of retaliation, he has not demonstrated that Defendant's reason for termination—misuse of company resources and other misconduct—was pretextual.

Plaintiff argues that pretext can be inferred by Defendant's failure to follow its own corrective action policy which provides an employee three warnings before being discharged. Instead, Defendant terminated Plaintiff for a first-time offense.

The Employee Expense and Corporate Card Policy states that termination may result from repeated misuse of the company credit card. (Filing No. 48-5, Ex. E, Expense Policy at 3, 6) ("Misuse of Company resources and/or failure to comply with the Expense and Corporate Card Policy may result in corrective action up to and including discharge."). Plaintiff admitted using the corporate credit card for personal expenses, personal hotel charges, and sending inappropriate texts. Furthermore, Plaintiff cites no other employees who used his or her company credit card in the same personal manner he did.

The only evidence that slightly moves the needle in his favor are emails from Toebbe to Garmon and Chase on February 21, 2017. (*See* Filing No. 48-9, Ex. I, Feb. 21, 2017 Emails). Toebbe informed them that she planned to wait until Plaintiff returned to work before conducting the investigation's fact finding—as opposed to bringing Plaintiff in during his leave. (*Id.*). She further noted the items of suspicion that served as justification for the second investigation including Plaintiff's unauthorized hotel and cell phone charges. While Plaintiff argues he was 'ambushed' upon his return to work because Toebbe and Garmon had a personal vendetta against him, the emails in question are just evidence of their investigation into his actions—not of an underlying conspiracy. Without more, Plaintiff cannot show that Defendant's reason for his termination was anything other than his violation of company policy and misconduct. *See Zayas v. Rockford Memorial Hosp.,* 740 F.3d 1154, 1158-59 (7th Cir. 2014) (noting the pretext inquiry focuses on whether the stated reason is *in fact* the reason for the adverse employment action, not on whether the stated reason is accurate or fair).

**IV.    Conclusion**

For the reasons above, the court **GRANTS** Defendant's Motion for Summary

Judgment (Filing No. 41).[4]  Final judgment shall issue by separate order.

**SO ORDERED** this 20th day of September 2019.

RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana

Distributed Electronically to Registered Counsel of Record.

---

[4] Defendant also filed a Motion to Exclude Plaintiff's Expert Witness Testimony.  Since it does not affect summary judgment, the court **DENIES AS MOOT** Defendant's Motion to Exclude Plaintiff's Expert Witness Testimony (Filing No. 56).